## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>   *Plaintiff,*<br><br>v.<br><br>THE EQUIVALENT VALUE OF USDT, OR TETHER, AS CURRENTLY ASSOCIATED WITH TETHER WALLET ADDRESS ENDING IN Lbg1, TETHER WALLET ADDRESS ENDING IN XQMR, TETHER WALLET ADDRESS ENDING IN PWrp, TETHER WALLET ADDRESS ENDING IN L7Z8, TETHER WALLET ADDRESS ENDING IN v9fB, TETHER WALLET ADDRESS ENDING IN bjKR, TETHER WALLET ADDRESS ENDING IN 3GXY, TETHER WALLET ADDRESS ENDING IN EpWN, TETHER WALLET ADDRESS ENDING IN KEh3, TETHER WALLET ADDRESS ENDING IN QmYC, TETHER WALLET ADDRESS ENDING IN yweB, and TETHER WALLET ADDRESS ENDING IN LhzQ.<br><br>   *Defendants.*<br><br>[CLAIMANT: TETHER] | No. |

## VERIFIED COMPLAINT OF FORFEITURE

Now comes Plaintiff, United States of America, by and through its attorneys, David X. Sullivan, United States Attorney for the District of Connecticut, and David C. Nelson, Assistant United States Attorney, and respectfully states that:

1.     This is a civil *in rem* action brought to enforce the provisions of 21 U.S.C. § 841, 21 U.S.C. § 846, 21 U.S.C. § 959, 18 U.S.C. § 1956, and 18 U.S.C. § 1957.

2.     This Court has jurisdiction over this matter by virtue of 28 U.S.C. §§ 1345 & 1355.

Venue is appropriate in the District of Connecticut by virtue of 28 U.S.C. § 1395(b).

3.  The Defendant Assets are the equivalent value of USDT, or Tether,[1] as associated with Tether Wallet Addresses TWGwJmYhNUbmoATQJU3QDLAR7EbYox**Lbg1** ("Defendant Asset 1"); TJdrDmYN2X7TXmF7Yjz3GbTgTobYJv**XQMR** ("Defendant Asset 2"); TCjtL9WxvY7qzWk4J9QUvJm9CToXV1**PWrp** ("Defendant Asset 3"); TBVsdsFnsAf7Cm9KnV4U1jgRTkKXZz**L7Z8** ("Defendant Asset 4"); TKAHZVAVoyyeasWm5fzsegBPwnQ1EU**v9fB** ("Defendant Asset 5"); TJwaP2Fq8bFvddNv4byJWRMYSv1YqH**bjKR** ("Defendant Asset 6"); TSUEmPpEZ3oUw3j3dbegE9TFJq2JdH**3GXY** ("Defendant Asset 7"); TXZNtYqKknp71j8aJtP6ZL1zTj3zXy**EpWN** ("Defendant Asset 8"); TW3jgHgVJtdB21fosUnJZu5pvHPvBh**KEh3** ("Defendant Asset 9"); TYTGCPXXdM4koK643vQFMpsRyrrjsX**QmYC** ("Defendant Asset 10"); THsxtR7KZ7L1KP6HULkHHZnMBeA2zH**yweB** ("Defendant Asset 11"); TK2tt8hVaTdhSFEGfWTYJUuajQs7LU**LhzQ** ("Defendant Asset 12") (collectively, "Defendant Assets").

4.  The Defendant Assets are property constituting, or derived from, any proceeds obtained, directly or indirectly, as a result of the distribution of controlled substances in violation of 21 U.S.C. § 841 and/or 21 U.S.C. § 959, or a conspiracy to commit such offenses in violation of 21 U.S.C. § 846,  and/or any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of such offenses, and, therefore, subject to forfeiture pursuant to 21 U.S.C. § 881(a).  Additionally, the Defendant Assets are property involved in money laundering offenses, or a conspiracy to

---

[1] Tether is a type of cryptocurrency known as a stable coin that is pegged to the United States dollar, where one USDT is designed to be worth one U.S. dollar at all times.

commit such offenses, in violation of 18 U.S.C. §§ 1956 and 1957 and/or is property traceable such property, and therefore subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A).

5.   The Defendant Assets are located within the jurisdiction of this Court.

### Background

6.   Transnational Criminal Organizations ("TCO") use a variety of methods to move the proceeds of their drug distribution and other funds to further their drug trafficking operations.  One method involves moving cryptocurrency through unhosted cryptocurrency wallets.  Specifically, by moving cryptocurrency through unhosted wallets, TCOs are able to conceal—or attempt to conceal—the source of their funds. As a result, cryptocurrency wallets are involved in money laundering.

7.   In this case, law enforcement knows through facts learned during its investigation, set forth below, that certain cryptocurrency transactions and wallets contained proceeds of drug trafficking, facilitated drug trafficking, and were involved in money laundering. Focusing on these transaction and wallets, law enforcement then used blockchain analysis tools to trace backward, to learn which wallets transferred cryptocurrency to the identified wallets, and trace forwards, to learn where the identified wallets sent cryptocurrency.  All of the transactions herein were made in furtherance of the TCO's drug trafficking conspiracy.

8.   Since 2023, law enforcement has been investigating a TCO.  This TCO smuggles kilogram quantities of methamphetamine and fentanyl into the United States.

9.   Prior to the sale of methamphetamine and fentanyl, the TCO, or those working on its behalf, must take several steps.

10.    These steps include laundering money to support these sales, usually through brokers in South and Central America, who launder suspected drug proceeds from the United States back to source countries and elsewhere, mainly via cryptocurrency.

11.    During a portion of this investigation, a Federal Bureau of Investigation (FBI) Confidential Source (CS) was introduced to Suspect #1 to discuss Suspect #1's drug trafficking methods and abilities. Suspect #1 is located in Mexico.

12.    Since the inception of this investigation in 2023, the CS has had access to Suspect #1 and was able to gain intelligence on drug trafficking routes, purchase prices, and main suppliers of narcotics to the United States.

13.    On behalf of the Government, the CS conducted meetings, phone calls, text messages and WhatsApp calls between members of the TCO.

14.    During this investigation and investigations prior, law enforcement has acquired fentanyl from Suspect #1 through his drug trafficking organization (hereinafter "Suspect DTO").

15.    During one of these investigations, the Suspect DTO assisted in the coordination of a drug smuggling event, which involved a successful purchase of kilograms of fentanyl in the United States.

16.    Throughout the course of the investigation, law enforcement utilized the CS to conduct recorded calls.  In May of 2025, the CS conducted a recorded call with Suspect #1, who utilized an encrypted application.

17.    During this recorded call, Suspect #1 stated that he was getting ready to sell the "200," which, in the context of the conversation, meant 200 pounds of methamphetamine. Suspect #1 stated he was on his way from Mexicali, Mexico to Tijuana, Mexico to meet with his friend.

18.     Suspect #1 told the CS that Suspect #1 needed the CS to assist him with the sale of "200" because cryptocurrency would be the payment method for the methamphetamine. Suspect #1 stated that the organizers of the cryptocurrency transfers sent $10 in cryptocurrency to a cryptocurrency wallet to confirm that the wallet was working properly.

19.     Suspect #1 stated the funds would arrive in two cryptocurrency transfers—one for $60,000 and one for $70,000—totaling $130,000.  Suspect #1 stated he would sell the methamphetamine at "680" (dollars per pound) instead of "700" (dollars per pound).  The CS requested that Suspect #1 send a screenshot after the transfers were completed so Suspect #1 could ensure it was successful.

20.     Later in May of 2025, the CS spoke again with Suspect #1. During this call, Suspect #1 stated he was in Baja California, Mexico because the deal was not finalized. Suspect #1 stated the buyers would send a deposit for $5,000, to reassure that the deal was going to happen. Law enforcement later learned that that deposit for $5,000 USDT was successfully transferred.

21.     Shortly thereafter, law enforcement learned that Suspect #1's associates sent $60,000 in USDT up front for approximately 200 pounds of crystal methamphetamine that would be sold within the United States,

22.     Law enforcement obtained a photograph of a transaction. This photograph depicts a cryptocurrency transfer utilizing USDT to conduct this transaction for $59,990 USDT. This photograph also shows a partial receiving address of "THnHv1E…Ponmank." Law enforcement investigated this USDT wallet utilizing law enforcement databases and learned that the full wallet was THnHv1E1NdZq1wo5id1SG1huoPePon**mank**. This

wallet received $10 USDT prior to sending the $59,990 USDT. Law enforcement learned that wallet **mank** belonged to an associate of Suspect #1.

23. Notably, wallet **mank** had also transferred funds through two different wallets, which funds eventually transferred to wallet TFg7bFTc3NDLFjF2aEryRrhjCpNS3F**diem**. Wallet **diem** was also seized by the Government as is part of the forfeiture case at docket number 3:25-cv-1384 (VAB).

24. The CS spoke with Suspect #1, and Suspect #1 confirmed that the purchasers of the methamphetamine paid the $60,000.

25. Later in May of 2025, the CS spoke with Suspect #1. Suspect #1 explained to the CS that the buyers for the methamphetamine had no issues sending the rest of the payment. During this call, Suspect #1 said that his friend has a friend who is the brother of the person who manages the wallet for the people in Australia and who are looking to purchase methamphetamine. Suspect #1 also stated the individual from Australia sent $1 million dollars to exclusively buy methamphetamine.

26. Law enforcement learned that the Australian buyers referenced above asked to purchase an additional 400 pounds of methamphetamine.

27. Later in May of 2025, the CS spoke with Suspect #1 about the sale of methamphetamine in Connecticut. During this call, Suspect #1 confirmed there would be "carpets," which law enforcement knows to be a code word for methamphetamine, that would arrive on May 30, 2025. Suspect #1 and the CS spoke about how there was a client in Connecticut who would pay more for the methamphetamine. Suspect #1 confirmed he has people that could send methamphetamine to Connecticut. Suspect #1 reassured the CS that more methamphetamine will arrive after May 30th.

28.     Later in May of 2025, the CS spoke with Suspect #1 about the sale of methamphetamine

in Connecticut.  Suspect #1 confirmed "250 units," which is another code word for

pounds of methamphetamine, would arrive in the United States, and that Suspect #1 was

told that he would receive half of methamphetamine and he could go to "the north."

Within the context of this overall scheme, "the north" means the upper Northeastern part

of the United States, including New York, Connecticut and Massachusetts.  Suspect #1

told that CS that he would travel to Connecticut to sell the methamphetamine.

29.     Law enforcement later learned that Suspect #1 was preparing to sell another 250 pounds

of methamphetamine.

## Tracing

30.     Cryptocurrency transactions are often utilized to launder the proceeds derived from

narcotic trafficking.  More specifically, narcotics traffickers in source countries (e.g.,

Mexico and Colombia) provide narcotics to consumer countries (e.g., the United States).

The bulk currency proceeds derived from the sale of these narcotics are then returned to

the narcotics traffickers within the source countries utilizing various methods, including

the use of cryptocurrencies.

31.     Narcotics traffickers often contact brokers, or professional money launderers, who are

responsible for collecting the bulk currency within the consumer countries and depositing

the currency into the banking system.  The brokers often then pay out the narcotics

traffickers in fiat currency within the source countries, minus a commission, and sell the

cryptocurrency to a separate "crypto" broker.  These crypto brokers then often sell the

cryptocurrency in the black market in exchange for various fiat currencies.

32.     Law enforcement identified the Defendant Assets and other cryptocurrency wallets that

were involved transferring USDT to support the methamphetamine purchases described above.

33.    Times throughout this section are listed as Coordinated Universal Time ("UTC").

34.    Defendant Asset 11 paid wallet **mank** the initial $5,000 USDT on May 8, 2025, at approximately 1:37 a.m.  This $5,000 transaction was the deposit / reassurance payment referenced above related to the sale of methamphetamine.

35.    Defendant Asset 2 provided the cryptocurrency initially fund Defendant Asset 11, THsxtR7KZ7L1KP6HULkHHZnMBeA2zH**yweB**.

36.    Defendant Asset 2, in addition to funding Defendant Asset 11, also paid wallet **mank**. Defendant Asset 2 sent approximately $67,000 in USDT to wallet **mank**.  This took place over two transactions: first, a transaction worth approximately $10; and second, almost a week later on May 12, 2025, at approximately 04:13 a.m., a transaction worth approximately $66,920.  These transactions correspond to the purchase of methamphetamine that the CS discussed with Suspect #1.

37.    Defendant Asset 1 also paid wallet **mank**.  Specifically, Defendant Asset 1 sent approximately $60,000 worth of USDT to wallet **mank** on May 9, 2025.  This corresponded with the call referencing the payment of $60,000 for purchase of methamphetamine and the screenshot of the transfer receipt.

38.    Defendant Asset 1 and Defendant Asset 2 also transferred cryptocurrency between each other.

39.    Looking backwards, Defendant Asset 1 and Defendant Asset 2 were funded in part from Defendant Asset 4.   Defendant Asset 4 sent approximately $199,985 worth of USDT to Defendant Asset 2 on May 7, 2025, at 4:04 p.m. and $194,982 USDT to Defendant Asset

2 on May 20, 2025, at 10:46 p.m.  Defendant Asset 4 sent to Defendant Asset 1 approximately $100,000 worth of USDT on May 13, 2025.

40.   Defendant Asset 11, which paid wallet **mank**, also had significant transfers between itself and Defendant Asset 4.  In the span of 39 days, there was approximately $795,000 worth of USDT transferred between Defendant Asset 4 and Defendant Asset 11.

41.   Looking forward, Defendant Asset 1 and Defendant Asset 2 partially funded Defendant Asset 3.  Defendant Asset 1 sent approximately $10 worth of USDT to Defendant Asset 3 on May 29, 2025, at approximately 12:33 a.m.  Less than one hour later, Defendant Asset 1 sent approximately $350,000 worth of USDT to Defendant Asset 3.  Within minutes of that transfer, Defendant Asset 2 sent approximately $149,990 of USDT to Defendant Asset 3.

42.   The transfers from Defendant Assets 1 and 2 to Defendant Asset 3 referenced above correspond to the sale of methamphetamine in Connecticut and the surrounding states as alleged above.

43.   On May 29, 2025, at approximately 3:57 a.m., after receiving the transfers from Defendant Assets 1 and 2, Defendant Asset 3 sent approximately $14,200 worth of USDT to Defendant Asset 5.

44.   Similarly, Defendant Asset 3 sent approximately $332,877 worth of USDT in three transactions between May 29, 2025, and May 30, 2025, to wallet TPq7Bxr6pZPpBWpFAhqJ3XitePgnZC**aEoG**.  Wallet **aEoG**, in turn, transferred over $1,000,000 worth of USDT to wallet TENLFJ53DeEn5uzurX55ns6pRrnkDg**e8Lr** between May 27, 2025, and May 31, 2025.  After **e8Lr** received the cryptocurrency, it rapidly transferred the cryptocurrency to Defendant Asset 8.

45.   Finally, Defendant Asset 3 also sent approximately $15,000 of USDT to Defendant Asset 7 on May 29, 2025, at approximately 3:06 a.m..

46.   The same day that Defendant Asset 3 sent cryptocurrency to Defendant Asset 7, Defendant Asset 7 sent approximately $15,000 of USDT to Defendant Asset 10.

47.   In turn, on May 30, 2025, at 9:11 a.m., Defendant Asset 10 sent approximately $20,000 of USDT to Defendant Asset 12.

48.   Defendant Asset 12 was also funded in part by Defendant Asset 6.  On May 30, 2025, at approximately 8:33 p.m., Defendant Asset 6 sent $5,000 worth of USDT to Defendant Asset 12. In turn, Defendant Asset 6 had been funded in part by Defendant Asset 3 (which, as described above, was funded by Defendant Assets 1 and 2). Specifically, Defendant Asset 3 sent approximately $50,000 worth of USDT to Defendant Asset 6 on May 29, 2025, at approximately 2:03 a.m.

49.   Defendant Asset 12, therefore, was ultimately funded by Defendant Assets 1, 2, 3, 4, 6, 7, and 10.

50.   Defendant Asset 6 also sent cryptocurrency to Defendant Asset 9.  Between May 29, 2025, and May 30, 2025, Defendant Asset 6 sent a total of approximately $168,322 worth of USDT to Defendant Asset 9.

51.   The following table and chart provide a visual representation of the above transactions.[2]

---

[2] Wallet **mank** is abbreviated as THnHv1E1NdZ.  Additionally, the chart refers to the Defendant Assets as "Target Wallets," but the numbering remains the same, *i.e.*, Defendant Asset 1 is equivalent to Target Wallet 1.

| Defendant Asset | Chart Abbreviation | Full Address |
|---|---|---|
| 1 | TWGwJmY | TWGwJmYhNUbmoATQJU3QDLAR7EbYox**Lbg1** |
| 2 | TJdrDmYN | TJdrDmYN2X7TXmF7Yjz3GbTgTobYJv**XQMR** |
| 3 | TCjtL9Wx | TCjtL9WxvY7qzWk4J9QUvJm9CToXV**1PWrp** |
| 4 | TBVsdsFn | TBVsdsFnsAf7Cm9KnV4U1jgRTkKXZz**L7Z8** |
| 5 | TKAHZVAV | TKAHZVAVoyyeasWm5fzsegBPwnQ1EU**v9fB** |
| 6 | TJwaP2Fq | TJwaP2Fq8bFvddNv4byJWRMYSv1YqH**bjKR** |
| 7 | TSUEmPpE | TSUEmPpEZ3oUw3j3dbegE9TFJq2JdH**3GXY** |
| 8 | TXZNtYqK | TXZNtYqKknp71j8aJtP6ZL1zTj3zXy**EpWN** |
| 9 | TW3jgHgV | TW3jgHgVJtdB21fosUnJZu5pvHPvBh**KEh3** |
| 10 | TYTGCPXX | TYTGCPXXdM4koK643vQFMpsRyrrjsX**QmYC** |
| 11 | THsxtR7K | THsxtR7KZ7L1KP6HULkHHZnMBeA2zH**yweB** |
| 12 | TK2tt8hV | TK2tt8hVaTdhSFEGfWTYJUuajQs7LU**LhzQ** |



52.    The Defendant Assets were seized pursuant to seizure warrants issued in the District of

Connecticut.

53.    The USDT tokens were burned and reissued pursuant to the seizure warrants.

54.    The Defendant Assets are subject to forfeiture as they contain proceeds of drug

trafficking and/or facilitating drug trafficking and/or were involved in money laundering.

Wherefore, the United States of America prays that a Warrant of Arrest In Rem be issued

for Defendant Assets; that due notice be given to all parties to appear and show cause why the

forfeiture should not be decreed; that judgment be entered declaring the property to be

condemned and forfeited to the United States of America for disposition according to law; and

that the United States of America be granted such other relief as this Court may deem just and

proper, together with the costs and disbursements of this action.

The United States requests a trial by jury.

DAVID X. SULLIVAN,
UNITED STATES ATTORNEY


By:___/S/ David C. Nelson_____
      David C. Nelson (ct25640)
      Assistant U.S. Attorney
      157 Church Street, 24th Floor
      New Haven, Connecticut 06510
      Tel:    (203) 821-3700
      Fax:    (203) 773-5373
      David.C.Nelson@usdoj.gov

## **<u>DECLARATION</u>**

I am a Task Force Officer with the DEA, and the individual assigned the responsibility for this case.

I have read the contents of the foregoing Verified Complaint of Forfeiture and the statements contained therein are true to the best of my knowledge and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 28th day of August, 2025.

/s/ _____
MICHAEL LONEY
TASK FORCE OFFICER, DEA